**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**


ELIJAH DOMINGUEZ,

        Plaintiff,

v.                                 CV 14-875 MV/KRS

COLFAX COUNTY,
RATON POLICE OFFICERS
D. BREITFELDER,
and HOLLAND, and CORRECTIONAL OFFICER
JAMES SALAZAR, LIEUTENTANT ROSE BERNAL,
and ADMINISTRATOR GABRIEL SANDOVAL
Of the VIGIL/MALDONADO
[COLFAX COUNTY] DETENTION CENTER,

        Defendants.


## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Amended Motion for Summary

Judgment on Claims Against Individual County Defendants and Memorandum of Law in

Support Thereof [Doc. 70]. The Court, having considered the motion, briefs, and relevant law,

and being otherwise fully informed, finds that the Motion is well-taken in part and not well-taken

in part and will be granted in part and denied in part.

### BACKGROUND

"The facts supported by evidence, [viewed] in the light most favorable to [Plaintiff]" as

the party opposing summary judgment, are as follows.[1] *Cavanaugh v. Woods Cross City*, 625

---

[1] In his response in opposition to Defendants' motion, Plaintiff sets forth certain facts that are
based solely on the affidavits of Stuart Grassian, M.D., and Shannon McReynolds, which
Plaintiff attaches as exhibits to his response. Docs. 74-7, 74-9. As explained below, the Court
determines that the testimony of these experts is not admissible for purposes of the instant
motion. As a result, the Court has not included in its statement of facts any of the facts

F.3d 661, 662 (10th Cir. 2010).   At approximately 11:00 a.m. on May 24, 2013, the Friday

leading into Memorial Day Weekend, Raton Police Officers Breitfelder and Holland were

dispatched to the Denny's restaurant in Raton, New Mexico, in response to complaints that a

man, later identified as Plaintiff Elijah Dominguez, was creating a disturbance inside the

restaurant.   Doc. 70-1.   Upon arrival, Breitfelder and Holland recognized Plaintiff as the same

person who had been at a nearby McDonald's earlier that day engaging in similarly disturbing

behavior that resulted in a call to the police to which these same officers had responded.   Id.

The manager at Denny's reported to the officers that Plaintiff had been soliciting a ride

from the restaurant's customers, and was "quite disruptive, loudly preaching to customers about

his obscure religious beliefs and positions on gang violence and outreach to a lost world."   Id.

The manager further reported that Plaintiff "became verbally abusive when he was repeatedly

asked to leave," and "refused to leave and continued this activity" until the officers arrived.   Id.

As the officers entered the restaurant, they observed several customers leaving, who thanked the

officers "for their quick response."   Id.   Both at Denny's and at McDonald's earlier that day,

the officers "were approached by citizens telling [them] that Mr. Dominguez had created a

disturbance that made them uncomfortable, and they were leaving as a result."   Id.

Breitfelder and Holland arrested Plaintiff for disorderly conduct and transported him to

the Colfax County Detention Center (the "Detention Center").   Doc. 70-7.   At 11:24 a.m.,

Sergeant James Salazar booked Plaintiff into the Detention Center.   Doc. 70-2, Doc. 70-3.

The Administrator of the Detention Center, Gabriel Sandoval, was also present at the time of

Plaintiff's booking.   Doc. 70-6 at ¶ 3.   Correctional Officer Sanchez administered to Plaintiff a

Suicide Screening Questionnaire and a Medical Screening Questionnaire.   Docs. 70-4, 70-5.

proposed by Plaintiff that are based solely on the affidavits of Dr. Grassian and McReynolds.

The Suicide Screening Questionnaire instructed the Questioning Officer to "ask the detainee" specific questions. Doc. 70-4. The form indicates that Plaintiff responded "yes" to the following questions: "Has anyone in your family, or significant other ever attempted suicide? Do you have a psychiatric history? Do you have a history of drug or alcohol abuse? Have you ever made a previous attempt at suicide? Do you feel that you have nothing to look forward to in the future?" Id. Although the form asks for specific dates for psychiatric history and history of drug or alcohol abuse, and for the method of previous suicide attempts, no such information was noted on Plaintiff's form. Id. The form further instructed the Questioning Officer to complete specific questions. The Questioning Officer responded "yes" to the following questions: "Is the detainee showing signs of depression? Is the detainee acting or talking in a strange manner (cannot focus, hallucinating)?" Id.

The Medical Screening Questionnaire similarly asks for the officer to solicit "yes" or "no" responses from the detainee. Doc. 70-5. The form indicates that Plaintiff responded yes to having "any current illness or injury," and that, yes, he had been treated for heart problems, hypertension, diabetes, mental illness, tuberculosis, hepatitis, and bruises. Id. Although the form asks for dates of treatment, none are provided on the form. Id. The form further includes "Questions for Officers." Id. As to those questions, the Officer noted "yes" next to the question, "Is the inmate disoriented?" Id.

During the booking process, Plaintiff "was hard to keep on track . . . when answering simple questions." Doc. 70-7 at 1. Also during the booking process, Plaintiff "became disruptive." Doc. 70-6 at ¶ 7. As a result, Sandoval called Tri-County Behavioral Health Services "for help in calming him down." Id. at ¶ 7. Tri-County Behavioral Health Services, however, advised that they could not respond to the Detention Center at that time. Id. ¶ 7.

According to evidence submitted by Plaintiff, his brother, Marcel Dominguez ("Marcel"), saw Plaintiff's truck abandoned on the road, found a police officer, and asked whether there had been "any call outs" for Plaintiff. Doc. 74-10 at ¶¶ 2, 4, 5. The officer advised that there had been "an incident at McDonalds involving" Plaintiff, and that Plaintiff had been "taken to the local jail." Id. at ¶ 6. Marcel went to the jail and asked to see Plaintiff, but was not permitted to do so. Id. at ¶ 8. Marcel "told Jail staff that [Plaintiff] had been diagnosed with something like Schizophrenia and that he was under the care of [their] mother, and that [Plaintiff] needed medication and that his need was urgent." Id. at ¶¶ 9-10. Marcel "called [his] mother and got the name of [Plaintiff's] medication and then [he] told a staff member at the jail the medication [Plaintiff] needed." Id. at ¶ 12. While Defendants' evidence similarly establishes that, shortly after Plaintiff was booked into the Detention Center, "a male came into the administrative area and identified himself as Plaintiff's brother," according to Defendants' evidence, Plaintiff's brother "did not provide any information about Plaintiff beyond stating that he thought that Plaintiff needed to be on medication but he did not identify which medication Plaintiff needed nor did he provide any medications for Plaintiff at the time of this visit." Doc. 70-6 at ¶ 5.

When Salazar took Plaintiff to put on his jail uniform, Plaintiff "began talking vulgar and asked [Salazar] to hurt him." Doc. 70-7 at 1. "Because of his [demeanor] and his answers on intake (medical and suicidal) forms," Salazar had Plaintiff "fill out a medical request form to see a doctor." Id. Initially, Salazar placed Plaintiff in a "holding tank" with two other inmates. Id. Five minutes later, he "had to remove the other two inmates and place them somewhere else because [Plaintiff] was talking vulgar to them." Id. Plaintiff was then "housed by himself." Id. Plaintiff thereafter "removed his jail uniform and was yelling profanities and pouring water upon himself in the nude." Id. Plaintiff "had his clothing on and off most of the day." Id.

4

Over the three-day weekend, "Plaintiff was under constant video surveillance and was physically checked every 30 minutes." Doc. 70-6 at ¶ 10. Three "Resident Welfare/Safety Logs" were created, recording jail staff's observations of Plaintiff every 30 minutes. Doc. 70-8. The Log includes the following observations of Plaintiff made over the course of his four-day detention: "standing up walking around (nude)"; "walking around nude;" "walking around nude"; "walking around nude"; "walking around nude"; "sitting singing"; "pacing talking to the door"; "pacing talking to self"; "pacing back and forth, cursing"; "talk to himself"; "talk to himself"; "talking to himself – naked;" "walking back and forth naked"; "naked lying down"; "throwing cup at door"; "undressing, naked"; "yelling naked"; "undressing again"; "up walking around naked"; "naked talking to self"; "nude standing"; "walking around nude"; "sitting down talking to self"; "awake nude"; "awake nude, standing"; "awake standing walking around incoherent"; "sitting down taking pants off"; "lying down nude"; "up nude yelling incoherent"; "yelling – sitting in the nude"; "walking around in the nude"; "sitting down – nekkid [sic] – movement"; "laying down – nekkid [sic] – movement"; "walking around nude"; "walking around nude"; "standing/dancing"; "walking around nude"; "looking out window – nude"; "yelling at door nude"; "awake nude folding blanket"; "walking around screaming – delirious – no clothes"; "laying down yelling with no clothes"; "standing up yelling with no clothes"; "walking around yelling with no clothes"; "sitting down with no clothes"; "standing/throwing cup against wall and banging on door"; "standing up yelling"; "lying down fondling himself"; "howling"; "kneeling folding shirt nude"; "standing against wall nude"; "walking around nud [sic] talking to wall"; "laying down nude"; "dancing nude/walking around"; "walking around nued [sic]; "walking around yelling"; "laying down nude"; "laying down nude"; "laying down nude"; "standing by door nude"; "nude walking around"; "incoherent"; "undressed, up eating";

"awake nude"; "laying down talking to self"; "walking around with no clothing on (naked)"; "sitting there in the nude"; "nude standing up;" "walking around/taking clothing off (nude")"; walking around (naked)"; "walking around (nude)"; "walking around (nude)"; "walking around (nude)"; "walking around nude talking to himself".    Id.

The first Log, which is three pages long, begins at 1:34 p.m. on Friday May 24, 2013, and ends at 1:00 a.m. on Sunday May 26, 2013.    The bottom of the last page of the first Log indicates that it was received and signed by Sandoval; the date on which it was received is not legible.    The Administrator comments state:    "Mr. Dominguez needs mental health evaluation so he has been separated from the population so he does not get hurt.    Making racial slurs and telling staff he wants to kill them."    Id.    The second Log, which is three pages long, begins at 1:30 a.m. on Sunday May 26, 2013 and ends at 12:27 p.m. on Monday, May 27, 2013.    The bottom of the second page of the second Log indicates that it was received and signed by Sandoval on May 27, 2013.    The Administrator Comments state:    "Mr. Dominguez still being disrespectful to staff.    Tried contacting Judge so he could let Mr. Dominguez out but no reply." Id.    The third Log, which is two pages long, begins at 12:04 p.m. on Monday May 27, 2013 and ends at 15:30 p.m. on Tuesday May 28, 2013.    The second page of the third Log indicates that it was received and signed by Sandoval on May 28, 2013.    The Administrator Comments state: "Mr. Dominguez needs mental evaluation.    Hope to see the Judge today."    Id.

The Detention Center is too small to employ a staff doctor or operate an onsite medical clinic.    Id. at ¶ 6.    When a detainee has a medical emergency, Detention Center staff send the detainee, by ambulance, to the Miners' Colfax Medical Center ("Medical Center").    Id.    The Medical Center Emergency Department was the only facility "to which Plaintiff could be sent over the long weekend."    Id. at ¶ 8.    Sandoval "did not deem Plaintiff's condition to be a

medical emergency because he was not hurting himself and was placed in a private cell so that he would not be at risk of being harmed by any of the other detainees." Id. at ¶ 9.

The Colfax County Magistrate Court was closed over Memorial Day weekend. Doc. 70-6 at ¶ 8. On Tuesday May 28, 2013, Sandoval called Magistrate Judge Walton and requested that Plaintiff be brought before him as soon as possible. Id. at ¶ 11. Judge Walton then called to arrange for "video court" for Plaintiff. Doc. 70-7 at 1. Salazar and Sanchez took Plaintiff into the video courtroom. Id. After the hearing, Judge Walton ordered Salazar to have Plaintiff transported to the Medical Center for a medical evaluation. Id. Sanchez transported Plaintiff to the Medical Center at 4:30 p.m. Id.

At the Medical Center, Plaintiff was treated by attending physician Richard M. Amesquito, DO. Doc. 70-10 at 1. The Medical Center report indicates that the "chief complaint" for Plaintiff's visit was "psychosis as reported by his jailers." Id. The report further indicates that Plaintiff, while in custody at the county jail, had "been in a private secluded room because he [had] been acting psychotic, crazy, boisterous, agitated and some anxiety when in the company of other prisoners." Id. Plaintiff was "a poor historian" and would not give the Medical Center "any useful information" regarding his medical history, but Plaintiff's mother reported to the Medical Center that he suffered from psychosis. Id. The report describes Plaintiff as "agitated, anxious, non-cooperative," talking "in circles," "very loud and boisterous," and "verbally abusive to staff and accompanying police officers." Id. at 2. The report documents the "emergency room course" as follows: "While in the ER patient required Geodon 20 mg IM x2 [an antipsychotic drug] which finally made him sedate and easier to handle and not a threat to himself or others." Id. The report indicates that Dr. Amesquita assessed Plaintiff with psychosis and mania. Id. The report further indicates that the "plan" was to

admit Plaintiff to the ICU; "[c]onsult with mental health first thing in the morning"; and "[f]ind placement for [Plaintiff] for proper psychological evaluation and treatment." Id. The report notes that medical staff "consulted with the judge in [Plaintiff's] case," who found the plan to be acceptable. Finally, the report notes that Plaintiff was "admitted to the hospital in stable condition." Id.

The following day, on Wednesday, May 29, 2013, a Release Order and Bond was signed, releasing Plaintiff from custody on an unsecured appearance bond of $500. Doc. 70-11. The Order includes the following language: "Please release this defendant so that he can get mental evaluation and meds. We will send summons at later date." Id.

As a result of the foregoing facts, Plaintiff commenced an action in the Eighth Judicial District Court, Colfax County, in the State of New Mexico against Colfax County, Breitfelder, Holland, Salazar, Sandoval, and Rose Bernal, Lieutenant of the Detention Center. Doc. 1-2. Collectively, the Defendants removed the action to this Court on September 26, 2014. Doc. 1. In his Complaint to Recover Damages for Deprivation of Civil Rights and Violation of the Americans with Disabilities Act ("ADA"), Plaintiff, *inter alia*, alleges that the "County Defendants" violated his rights under Title II of the Americans with Disabilities Act (Count IV), and that Salazar, Sandoval and Bernal (hereinafter referred to as "Defendants") violated his due process rights under the Fourteenth Amendment by failing to provide medical care (Count V).

Defendants filed the instant motion for summary judgment, seeking dismissal of Counts IV and V as against them. Specifically, Defendants argue that Plaintiff is not permitted to bring an ADA claim against them in their individual capacity, and that they are entitled to qualified immunity on Plaintiff's due process claim. Plaintiff consents to dismissal of Count IV as to Defendants, but argues that they are not entitled to qualified immunity on his due process claim.

## LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the initial burden of establishing that there is an absence of evidence to support the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant meets this burden, the non-movant must come forward with specific facts, supported by admissible evidence, that demonstrate the existence of a genuine dispute. *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1526 n. 11 (10th Cir. 1992). The court "construe[s] the factual record and the reasonable inferences therefrom in the light most favorable to the nonmoving party." *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005).

In the instant case, Defendants move for summary judgment on the basis of qualified immunity. Qualified immunity protects government officials performing discretionary functions "when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011). In keeping with the purposes of qualified immunity, "special rules apply when an official raises a defense of qualified immunity on summary judgment." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 779 (10th Cir. 1993). Specifically, "qualified immunity requires a two-step sequence." *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012) (citation omitted). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* (citation omitted). "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001). The court has "the

freedom to decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009)).

"A constitutional right is clearly established when, at the time of the alleged violation, the contours of the right were sufficiently clear that a reasonable official would understand that his actions violate that right." *Lundstrom*, 616 F.3d at 1118-19 (citation omitted). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Fisher v. City of Las Cruces*, 584 F.3d 888, 900 (10th Cir. 2009) (citation omitted). Accordingly, a "plaintiff must do more than identify in the abstract a clearly established right and allege that the defendant has violated it." *Lundstrom*, 616 F.3d at 1119. Specifically, a "plaintiff must show legal authority making it apparent that in light of pre-existing law a reasonable official would have known that the conduct in question violated the constitutional right at issue." *Id.*

This does not mean that the plaintiff must "present a case with an identical factual situation." *Id.* To the contrary, the Supreme Court has made clear that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful"); *see also Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) ("The *Hope* decision shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described

10

conduct was unconstitutional."). The "salient question" thus is whether the state of the law at the time of the alleged misconduct gave the defendant "fair warning" that her alleged misconduct was unconstitutional. *Hope*, 536 U.S. at 741. In order to answer this question, the court looks to "Supreme Court or Tenth Circuit precedent on point or clearly established weight of authority from other courts finding the law to be as the plaintiff maintains." *Lundstrom*, 616 F.3d at 1119.

## DISCUSSION

### I. Plaintiff's ADA Claim

In Count IV of the Complaint, Plaintiff alleges violations of Title II of the ADA "against County Defendants." Doc. 1-2 ¶¶ 50-61. Defendants argue that Plaintiff's ADA claim should be dismissed as against them because Title II does not permit plaintiffs to sue state officials in their individual capacity. Doc. 70 at 5. In his response, Plaintiff clarifies that he is pursuing an ADA claim "solely against the County," and consents to the dismissal of his ADA claim as against Defendants. Doc. 74 at 11. Accordingly, based on the agreement of the parties, the Court will dismiss Count IV of the Complaint as against Defendants.

### II. Plaintiff's Due Process Claim

In Count V of the Complaint, Plaintiff alleges that Defendants violated his clearly established due process right as a detainee to receive medical care by failing to provide him with the medical care that they knew or should have known that he required. Doc. 1-2 at ¶¶ 62-69. Defendants argue that qualified immunity shields them from liability on Plaintiff's due process claim based on inadequate medical attention because (1) the undisputed material facts demonstrate that they did not violate Plaintiff's constitutional rights, and (2) assuming *arguendo* that they did violate Plaintiff's constitutional rights, the law was not clearly established at the

time of the violation of those rights.    According to Defendants, because Plaintiff thus cannot

meet either prong of the qualified immunity test, they are entitled to summary judgment on his

due process claim.

      A.    <u>Violation of Plaintiff's Constitutional Right to Receive Medical Care</u>

Under the first prong of the qualified immunity analysis, the Court must determine

whether, viewing the evidence in the light most favorable to Plaintiff, the facts show that

Defendants denied or delayed Plaintiff access to medical care in violation of his Fourteenth

Amendment rights.    *See Mata*, 427 F.3d at 749-50.    "Under the Fourteenth Amendment's Due

Process Clause, pretrial detainees are entitled to the same degree of protection against denial of

medical care as that afforded to convicted inmates under the Eighth Amendment."    *Barrie v.*

*Grand County, Utah*, 119 F.3d 862, 868 (10th Cir. 1997); *see also Blackmon v. Sutton*, 734 F.3d

1237, 1244 (10th Cir. 2013) ("[D]etention officials surely owe pretrial detainees . . . at least the

same standard of care prison officials owe convicted inmates.").    Accordingly, Plaintiff's due

process claim must be assessed under the "deliberate indifference" standard developed in the

Eighth Amendment context.    *Blackmon*, 734 F.3d at 1244; *Olsen v. Layton Hills Mall*, 312 F.3d

1304, 1315 (10th Cir. 2002) ("Although pretrial detainees are protected under the Due Process

Clause rather than the Eighth Amendment, this Court applies an analysis identical to that applied

in Eighth Amendment cases brought pursuant to § 1983").

Specifically, in *Estelle v. Gamble*, the Supreme Court held that "[a] prison official's

deliberate indifference to an inmate's serious medical needs is a violation of the Eighth

Amendment's prohibition against cruel and unusual punishment."    *Mata*, 427 F.3d at 751

(citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("[D]eliberate indifference to serious medical

needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the

Eighth Amendment.")).   Such deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."   *Estelle*, 429 U.S. at 104-05.   Of particular relevance here, "the deliberate disregard of a patient's psychological needs can violate a detainee's constitutional rights no less than the deliberate disregard of his physical needs."   *Blackmon*, 734 F.3d at 1245; *see also Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996) (holding that constitutional duty to provide necessary medical care to inmates includes psychological or psychiatric care); *Bee v. Greaves*, 744 F.2d 1387, 1395 (10th Cir. 1984) (holding that constitutional duty to treat medical needs of pretrial detainees "includes mental as well as physical disorders").

Under the *Estelle* deliberate indifference standard, the test for constitutional liability of prison officials "involves both an objective and a subjective component."   *Mata*, 427 F.3d at 751 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).   First, Plaintiff must show "objective evidence that the deprivation at issue was in fact 'sufficiently serious.'"   *Id.* "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."   *Sealock*, 218 F.3d at 1209 (citation omitted).   If a plaintiff's claim is based on a delay in medical care, the plaintiff also must show that "the delay resulted in substantial harm."   *Mata*, 427 F.3d at 751 (citation omitted).   "The substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain."   *Id.* (citation omitted).

In *Mata*, the Tenth Circuit clarified that, in determining whether the plaintiff has suffered substantial harm as a result of a delay in medical care, there are two distinct types of "substantial

harm" that the Court may consider. 427 F.3d at 753. First, the Court may consider "some

intermediate harm," such as the plaintiff's experience of prolonged or severe pain or suffering

during the period when medical attention was withheld or delayed. *Id.*; *see also Kikumura v.

Osagie*, 461 F.3d 1269, 1292 (10th Cir.2006) ("The 'substantial harm' can . . . be an intermediate

injury, such as the pain experienced while waiting for treatment and analgesics."), *overruled on*

*other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), as explained in *Robbins v.*

*Oklahoma*, 519 F.3d 1242, 1246–47 (10th Cir. 2008); *Beers v. Ballard*, 248 F. Appx. 988, 991

(10th Cir. 2007) ("Mr. Barnes may have suffered from greater or more prolonged pain, a

cognizable substantial harm," as a result of "the delay in attending to Mr. Barnes after his

collapse.") (citing *Sealock*, 218 F.3d at 1210 n. 5 ("[T]here is factual evidence from which a jury

could conclude that the delay occasioned by . . . inaction unnecessarily prolonged appellant's

pain and suffering."); *Oxendine v. Kaplan*, 241 F.3d 1272, 1278 (10th Cir. 2001) ("[T]he delay . .

. caused substantial harm due to the fact that . . . Oxendine experienced considerable pain.")).

Second, the Court may consider "the last untoward event to befall" the plaintiff, such as the

subsequent or long-term deleterious effect on the plaintiff's health caused by the prison's

dilatory response to his medical needs. *Mata*, 427 F.3d at 753; *see also Kikumura*, 461 F.3d at

1292 (The "'substantial harm' can be the ultimate physical injury caused by the prisoner's

illness, so long as the prisoner can show that the more timely receipt of medical treatment would

have minimized or prevented the harm."); *Beers*, 248 F. App'x at 991 ("[T]he time-frame for

administering life-saving treatment could have passed during the period of delay; if such

treatment had a realistic chance of success, the prison's dilatory response could be said to have

proximately caused his death.") (citing *Lewis v. Wallenstein*, 769 F.2d 1173, 1183 (7th Cir.

1985) ("[C]ausal connection existed between" doctor's 15 minute delay in attending to inmate

and inmate's death from cardiac arrest.)).    Regardless of which type of harm the detainee seeks to establish, "the focus of the objective prong should be solely on whether the harm is sufficiently serious."    *Id.*

For example, in *Sealock,* the plaintiff presented to prison staff with severe chest pain and ultimately suffered a heart attack.    The court first considered a possible claim that the heart attack itself was a sufficiently serious harm to establish the objective component of the deliberate indifference test, but rejected the claim because the plaintiff did not present specific medical evidence of a subsequent harm, namely, "damage to his heart resulting from the delay."    218 F.3d at 1210.    Nonetheless, the court found that the plaintiff had shown that his need was sufficiently serious to require prompt medical attention, based alone on the interim harm, namely, the symptoms that he presented to the prison staff:

> Appellant presented evidence that he suffered from severe chest pain which he reasonabl[y] believed was caused by a heart attack.    The pain and suffering imposed by Barrett's failure to get him treatment lasted several hours.    The Eighth Amendment forbids unnecessary and wanton infliction of pain. Certainly, not every twinge of pain suffered as a result of delay in medical care is actionable.    The evidence in this case, however, sufficiently establishes the objective element of the deliberate indifference test.

*Id.* (citations omitted).

In *Mata*, the plaintiff similarly presented to prison staff with severe chest pain and ultimately suffered a heart attack.    The court determined that "both Ms. Mata's severe chest pain and her heart attack each [were] sufficiently serious to satisfy the objective prong."    427 F.3d at 753.    Specifically, the court found that the plaintiff's evidence "that she did in fact suffer severe pain for several days" went "way beyond a twinge" and thus was alone sufficient to establish the objective element of the deliberate indifference test.    *Id.* at 755.    Further, the court found that evidence that the plaintiff suffered a heart attack was also independently

sufficient to establish the objective element of the deliberate indifference test. *Id.* Thus, the court concluded that the plaintiff had "exceeded the minimum evidentiary requirement . . . by presenting specific evidence that she suffered both unnecessary pain and a worsening in her condition – in the form of permanent and irreversible heart damage." *Id.*

Once a plaintiff has met the objective prong of the deliberate indifference test by demonstrating that his or her "medical need was objectively sufficiently serious and that defendants' delay in meeting that need caused [him] or her substantial harm," the plaintiff next must meet the subjective prong of the deliberate indifference test. *Id.* at 752. A detainee "may satisfy the subjective component by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of her condition." *Id.* at 756. "Even a brief delay may be unconstitutional." *Id.*

"The subjective prong of the deliberate indifference test requires the plaintiff to present evidence of the prison official's culpable state of mind." *Id.* at 751. Specifically, the subjective component is met if the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The deliberate indifference standard applies "not only to medical professionals who fail to treat, but also prison officials who assume 'gate keeping' authority over prisoner access to medical professionals." *Blackmon*, 734 F.3d at 1245. Accordingly, "one way a prisoner may satisfy the subjective component of the deliberate indifference test is to show that a 'gate keeping' prison official den[ied] or delay[ed] him access to medical care in conscious disregard of a substantial risk of serious harm." *Id.* (citation omitted).

16

Notably, "[d]eliberate indifference does not require a finding of express intent to harm." *Mitchell v. Maynard*, 80 F.3d 1433, 1442 (10th Cir. 1996). Accordingly, a detainee "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. In other words, "[t]o show the requisite deliberate indifference," a plaintiff "must establish that defendant(s) knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Kikumura*, 461 F.3d at 1293 (quoting *Farmer*, 511 U.S. at 847).

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. "It remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety." *Id.* at 844. Similarly, even "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.*

### Objective Component

In order to meet the objective prong of the deliberate indifference test, Plaintiff must demonstrate both that his medical need was objectively sufficiently serious and that Defendants' delay in meeting that need caused him substantial harm. *Mata*, 427 F.3d at 752. Defendants' own evidence establishes both the sufficiently serious nature of Plaintiff's medical need and the fact that Plaintiff experienced substantial harm as a result of Defendants' delay in meeting that need. Accordingly, Plaintiff has met his evidentiary burden as to the objective prong.

### *Plaintiff's Medical Need Was Sufficiently Serious*

The undisputed evidence establishes not only that Plaintiff's medical need was "diagnosed by a physician as mandating treatment," but also that it was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention," and thus that it was "sufficiently serious." *Sealock*, 218 F.3d at 1209. Specifically, once Plaintiff was transported to the Medical Center, Dr. Amesquito assessed Plaintiff with psychosis and mania, and treated him on an emergent basis for those conditions with an injection of an antipsychotic drug. Doc. 70-10 at 2. Dr. Amesquita then admitted Plaintiff to the hospital for a mental health consult and placement for a psychological evaluation and further treatment. Id. This evidence alone is sufficient to establish that Plaintiff's medical need was objectively sufficiently serious. *See Gray v. Geo Group*, No. 17-6135, 2018 WL 1181098, at *4 (10th Cir. Mar. 6, 2018) (holding that plaintiff's allegation that he was diagnosed and treated for bipolar, depressive, and psychotic disorders was sufficient to establish the objective component of his deliberate indifference claim regarding his mental health needs); *Olsen*, 312 F.3d at 1316 (reversing grant of summary judgment on detainee's due process claim because a jury could find that detainee's OCD, with which he had been diagnosed and for which he had been treated, was sufficiently serious to meet objective prong of deliberate indifference test); *Haden v. Green*, No. 10-cv-515, 2011 WL 7563786 (D. Colo. June 13, 2011) (holding that plaintiff demonstrated a serious medical need where he alleged that he was diagnosed with bipolar disorder, general anxiety disorder, and obsessive compulsive disorder) (citing *Petersmarck v. Parks*, No. 09-327, 2009 WL 3713650 (S.D. Ill. Nov. 4, 2009) (finding plaintiff stated claim for deliberate indifference where plaintiff alleged he was diagnosed as bipolar with manic depression); *Miller v. McDaniel*, 2007 WL 396996 at *6 (D. Nev. Feb. 1, 2007) (holding that bipolar disorder is a serious medical need);

*Means v. Huibregtse*, 2003 WL 23109378, at *1 (W.D. Wis. Jan. 6, 2003) (holding that allegations of anxiety and bipolar disorder were sufficient to suggest plaintiff had serious medical needs)).

Moreover, Plaintiff's need for mental health treatment was clearly manifested by his symptoms, which continued virtually without interruption from the moment that he arrived at the Detention Center until he was transported to the Medical Center four days later. During administration of the initial screening questionnaires and the booking process, Plaintiff showed "signs of depression", was "acting in a strange manner ([could not] focus, [was] hallucinating)," was "disoriented," was "hard to keep on track . . . when answering simple questions," and was so "disruptive" that Sandoval found it necessary to call Tri-County Behavioral Health Services "for help in calming him down." Docs. 70-4 to 70-7. Indeed, Plaintiff's need for medical attention was so clear from his "demeanor" that Salazar had Plaintiff "fill out a medical request to see a doctor." Doc. 70-7.

Once he was placed in a cell, Plaintiff continued to display clear signs of mental distress, "remov[ing] his jail uniform[,] yelling profanities and pouring water upon himself in the nude." Doc. 70-7. During the four days that he spent in the cell, Plaintiff repeatedly undressed, and was observed to be without any clothing no less than 55 times. Id. Until he was removed from his cell, Plaintiff was consistently observed talking to himself, talking to the door, pacing, talking or yelling incoherently, dancing, screaming, exhibiting signs of delirium, throwing things, banging on the door, and howling. Id. Indeed, Plaintiff's need for medical attention remained so clear from the symptoms he displayed while in his cell that Sandoval drew the conclusion that Plaintiff needed "a mental health evaluation." Doc. 70-6. This evidence provides a second, independent basis to establish that Plaintiff's medical need was objectively

sufficiently serious. *See Lopez-Aguirre v. Board of Cty. Comm'rs of Shawnee Cty., Kansas*, No. 12-2752, 2013 WL 1668239, at *4 (D. Kan. Apr. 17, 2013) (holding that allegations established that plaintiff's need was sufficiently serious where plaintiff alleged, *inter alia*, that he arrived with a mental illness, and that his behavior while in detention was erratic, including an inability to comply with instructions, smearing and sliding in feces and urine in his cell, expressing a desire to hurt himself, an unkempt appearance, shifts in outward emotional expressions, throwing water, hyperactivity, and an acutely psychotic appearance).

### *Plaintiff Suffered Substantial Harm*

The undisputed evidence also establishes that Plaintiff suffered a substantial "intermediate harm" as a result of Defendants' refusal to provide him access to medical care. *See Mata*, 427 F.3d at 753. Specifically, Plaintiff's mental distress continued from the time that he arrived at the Detention Center on Friday morning until he was given the injection of an antipsychotic drug at the Medical Center the following Tuesday afternoon, "which finally made him sedate and easier to handle and not a threat to himself or others." Doc. 70-10. Although Defendants continuously observed the symptoms of Plaintiff's psychosis and mania during his four-day detention, they did nothing to alleviate those symptoms. This evidence, namely, that Plaintiff's symptoms of severe mental disturbance continued unabated while in detention but were quickly ameliorated when he was seen by a doctor and administered the necessary medicine, demonstrates that the delay occasioned by Defendants' inaction unnecessarily prolonged Plaintiff's experience of psychosis and mania. Such prolonged suffering surely is as serious as the prolonged suffering occasioned by a delay in administering "treatment and analgesics" for physical pain, which the Tenth Circuit has repeatedly found sufficient to establish substantial harm for purposes of the objective prong of the deliberate indifference test. *See*

*Mata*, 427 F.3d at 753; *Kikumura*, 461 F.3d at 1292; *Beers*, 248 F. App'x at 991; *Oxendine*, 241 F.3d at 1272. Indeed, Plaintiff's mental disturbance and attendant suffering "imposed by [Defendants'] failure to get him treatment," lasted several days, rather than the several hours found sufficient in *Sealock*. 218 F.3d at 1210. As the court noted in *Sealock*, "the Eighth Amendment forbids unnecessary and wanton infliction of pain." *Id.* And while "not every twinge of pain suffered as a result of delay in medical care is actionable," just as in *Sealock*, the evidence in this case "sufficiently establishes the objective element of the deliberate indifference test." *Id.*

Defendants' arguments do not change this analysis. First, Defendants appear to argue that the evidence establishes no more than the severity of Plaintiff's underlying medical condition, and that such evidence is insufficient to establish that Plaintiff had an objectively serious medical need. Doc. 70 at 12; Doc. 80 at 9. In support of this proposition, Defendants cite to a Second Circuit case, *Smith v. Carpenter*, in which the plaintiff appealed the denial of a motion for new trial after a jury verdict in favor of the defendant prison officials. 316 F.3d 178, 185 (2nd Cir. 2003). The court stated that "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than on the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support an Eighth Amendment claim." *Id.* at 185 (emphasis in original; citations omitted). By contrast, the court stated, where "the prisoner alleges that prison officials have failed to provide general treatment for his medical condition," "[t]here is no need to distinguish between a prisoner's underlying serious medical condition and the circumstances of his serious medical need." *Id.* Indeed, the court noted that

21

it has used the terms "serious medical condition" and "serious medical need" "interchangeably in analyzing denial of medical claims under the Eighth Amendment." *Id.* at 185 n. 9.

In the instant case, Plaintiff does not base his claim on a "temporary delay or interruption in the provision of otherwise adequate medical treatment," but rather alleges that Defendants "failed to provide general treatment for his medical condition." *Id.* at 185. Accordingly, *Smith* provides no support for Defendants' suggestion that this Court should distinguish between Plaintiff's underlying serious medical condition and the circumstances of his serious medical need, which, as *Smith* makes clear, are interchangeable for purposes of the instant analysis. Further, the *Smith* court specifically noted that nothing in its decision was meant to suggest that the plaintiff's "claim would not have survived a motion to dismiss or motion for summary judgment." *Id.* at 188 n. 14. Accordingly, *Smith* provides no guidance for this Court in determining whether Plaintiff his met his burden of demonstrating that his medical need was objectively sufficiently serious for purposes of defeating Defendants' motion for summary judgment.

Second, Defendants argue that they were never "presented with symptoms with which they knew potentially created a medical emergency for Plaintiff." Doc. 80 at 10. Defendants' own evidence belies this contention. As detailed above, Plaintiff manifested symptoms of mental disturbance from the very moment he arrived at the Detention Center – symptoms that were personally observed and recorded by Defendants themselves, and indeed recognized by Defendants as necessitating a request to see a doctor and a mental evaluation. Also as detailed above, Plaintiff's symptoms – continuously observed by Defendants – continued unabated until he was transported to the Medical Center four days later. This case thus is distinguishable from *Amick v. Ohio Dep't of Rehab. & Corr.*, cited by Defendants in support of their position, in

which the court found that the plaintiff's allegations "reveal[ed] no hint of increasing symptomatology or behavioral problems during most of the five months [the inmate] was incarcerated in state prison facilities." 521 F. App'x 354, 358 (6th Cir. 2013). The court found the plaintiffs' deliberate indifference claim "facially deficient for its failure to satisfy the objective component requirement" because "according to plaintiffs' own allegations, Amick would appear to have made an acceptable and unremarkable adjustment to prison life without medications for almost five months," and it was not until "the final days of his life that symptoms became manifest." *Id.* Here, in stark contrast, Plaintiff's symptoms were manifest throughout the duration of his detention, and at no time did he make "an acceptable and unremarkable adjustment" without access to medical care. Accordingly, nothing in *Amick* suggests that Plaintiff's medical need was not objectively sufficiently serious.

Importantly, Defendants ignore the undisputed fact that Plaintiff was assessed with psychosis and mania, was treated on an emergent basis for those conditions with an injection of an antipsychotic drug, and was admitted to the hospital for a mental health consult and placement for a psychological evaluation and further treatment. Regardless of whether Plaintiff's medical need was so obvious that even a lay person would easily recognize the necessity for a doctor's attention, the evidence that Plaintiff's medical need was diagnosed by a physician as mandating treatment is alone sufficient to establish that Plaintiff's medical need was objectively sufficiently serious. *Sealock*, 218 F.3d at 1209.

Finally, Defendants argue that because there is no admissible evidence that "any alleged untimely response to Plaintiff's mental health conditions had any causal effect," or that "the outcome would have differed, i.e. that Plaintiff would have been less manic, less psychotic, or less anxious, with a quicker response," Plaintiff has failed to meet his burden of demonstrating

23

that he suffered substantial harm as a result of Defendants' delay in meeting his need for medical attention.    Doc. 70 at 12; Doc. 80 at 9, 17.    In other words, Defendants contend that Plaintiff has failed to establish that any subsequent or long-term deleterious effect on Plaintiff's mental health was actually caused by Defendants' dilatory response to his medical needs.    This contention reflects a fundamental misunderstanding of the controlling standard for determining whether Plaintiff suffered "substantial harm."    Defendants repeatedly cite to *Mata* for the proposition that "the substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." 427 F.3d at 751.    Defendants, however, fail to acknowledge that *Mata* and the other Tenth Circuit cases discussed above further hold that, in determining whether a plaintiff has suffered substantial harm as a result of a delay in medical care, the Court may consider "some intermediate harm" to the plaintiff, so long as that "harm is sufficiently serious."    *Id.* at 753.    Nowhere do Defendants address, much less refute, that under this controlling precedent, Plaintiff's prolonged experience of psychosis and mania, which undoubtedly was caused by Defendants' inaction, was an intermediate harm sufficiently serious to satisfy the substantial harm requirement.    Defendants do not – and indeed cannot – deny that their delay in providing Plaintiff access to medical care prolonged his mental disturbance and attendant suffering for four days; this prolonged mental disturbance and suffering is sufficiently serious to satisfy the substantial harm requirement.

The Court notes that, in reaching this conclusion, it did not consider the affidavit of Dr. Grassian.    As Defendants contend, Plaintiff has failed to establish that the testimony of these experts is sufficiently reliable.    Doc. 80 at 3-6.    In his affidavit, Dr. Grassian notes that he has "special expertise regarding the psychiatric effects of solitary confinement" and "extensive experience in evaluating the psychiatric effects of solitary confinement."    Doc. 74-7 at ¶¶ 1-2.

24

He also notes that he has served as an expert witness "regarding the psychiatric impact of segregated confinement." Id. at ¶ 2. Although his affidavit notes that his Curriculum Vitae is attached thereto, no such attachment was provided to the Court. *Id.* at ¶ 2. Based on his "specialized knowledge," Dr. Grassian opines, *inter alia*, that Plaintiff "suffered substantial harm as a result of [Defendants'] failure to provide prompt psychiatric care." *Id.* at ¶ 5.

Although "[a]n expert's testimony can rely solely on experience," when that is the case, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Nacchio*, 555 F.3d 1234, 1258 (10th Cir. 2009) (citation omitted). Here, Plaintiffs did not offer any of this additional information. *Id.* Plaintiffs simply "relied on [Dr. Grassian's] qualifications to tip the balance in favor of admissibility of his expert testimony." *Id.* In doing so, Plaintiff "ignore[d] the precept that when assessing expert testimony, "the question before the trial court [i]s specific, not general." *Id.* Although Dr. Grassian "generally has been permitted to testify in the past, and a district court might well respect his credentials, the court ha[s] an obligation to assess the methodology that [Dr. Grassian] employed in the case at hand." *Id.* Accordingly, it was Plaintiff's burden to "demonstrate[] the admissibility of [Dr. Grassian's] testimony in this particular case." *Id.* Plaintiff utterly failed to meet this burden and, as a result, Dr. Grassian's opinion is inadmissible for purposes of the instant motion.

As discussed above, however, even without Dr. Grassian's opinion, the admissible evidence in this case establishes that Plaintiff suffered a substantial "intermediate harm" as a result of Defendants' delay in providing him access to medical care. Because the evidence thus demonstrates both that Plaintiff's medical need was objectively sufficiently serious and that

Defendants' delay in meeting that need caused him substantial harm, "there are genuine factual issues precluding summary judgment against [Plaintiff] on the objective component of the *Estelle* test." *Mata*, 427 F.3d at 755.

### Subjective Component

In order to meet the subjective component of the deliberate indifference test, Plaintiff "must establish that Defendants knew he faced a substantial risk of harm and disregarded that risk, 'by failing to take reasonable measures to abate it.'" *Kikumura*, 461 F.3d at 1293 (quoting *Farmer*, 511 U.S. at 847). Because Defendants are not medical professionals but instead jail officials who assumed "gate keeping" authority over Plaintiff's access to medical professionals, Plaintiff's specific burden is to demonstrate that Defendants "denied or delayed him access to medical care in conscious disregard of a substantial risk of serious harm." *Blackmon*, 734 F.3d at 1245. Defendants' own evidence establishes that Defendants were aware of Plaintiff's unrelenting psychotic condition, yet failed to take the reasonable measure of providing Plaintiff access to medical treatment, by transporting him by ambulance to the Medical Center or otherwise, in order to abate that condition.

Specifically, the symptoms of Plaintiff's psychotic condition not only were obvious, but also were observed, recorded and identified by Defendants. Plaintiff's symptoms, and the record of those symptoms, continued virtually without interruption from the moment that he arrived at the Detention Center until he was transported to the Medical Center four days later. During administration of the initial screening questionnaires and the booking process, Plaintiff showed "signs of depression", was "acting in a strange manner ([could not] focus, [was] hallucinating)," was "disoriented," was "hard to keep on track . . . when answering simple questions," and was so "disruptive" that Sandoval found it necessary to call Tri-County

Behavioral Health Services "for help in calming him down." Docs. 70-4 to 70-7. Upon learning that Tri-County Behavioral Health Services could not provide any assistance, Defendants did not seek any alternative means of securing mental health services for Plaintiff. Nonetheless, Plaintiff's need for medical attention was so clear from his "demeanor" that Salazar had Plaintiff "fill out a medical request to see a doctor." Doc. 70-7.[2]

Further, from the initial screening questionnaires, Defendants learned that Plaintiff had a psychiatric history, had previously attempted suicide, felt that he had nothing to look forward to in the future, was suffering from a current illness or injury, and had been treated for mental illness. Docs. 70-4, 70-5. Similarly, shortly after Plaintiff was booked into the Detention Center, Defendants were put on notice by Plaintiff's brother, Marcel, that Plaintiff needed to be on medication for his mental health condition. Docs. 70-6, 74-10.[3] After receiving this information regarding Plaintiff's physical and mental health history and current need for medication, and observing Plaintiff's symptoms during the booking process, Defendants decided to "house" Plaintiff by himself, keep him "under constant video surveillance," and "physically check[]" him "every 30 minutes." Docs. 70-7; 70-6.

Once he was placed in a cell, Defendants observed that Plaintiff continued to display clear signs of mental distress, "remov[ing] his jail uniform[,] yelling profanities and pouring

---

[2] There is no evidence that Plaintiff's request to see a doctor was granted. Further, it is unclear how such a request could be granted, when the Detention Center is too small to employ a staff doctor or operate an onsite medical clinic. Doc. 70-6 at ¶ 6.

[3] According to Plaintiff's evidence, Plaintiff's brother, Marcel, advised jail staff that Plaintiff had been diagnosed with "something like Schizophrenia," was under their mother's care, and urgently needed medication, the name of which he relayed to jail staff. Doc. 74-10. Although Defendants' evidence provides a different version of events regarding Marcel's visit to the Detention Center, Defendants' evidence similarly demonstrates that, shortly after Plaintiff was booked into the Detention Center, Marcel arrived at the Detention Center and stated that "Plaintiff needed to be on medication." Doc. 70-6.

water upon himself in the nude." Doc. 70-7. During the four days that he spent in the cell, Plaintiff repeatedly undressed, and was observed to be without any clothing no less than 55 times. Id. Until he was removed from his cell, Defendants consistently observed Plaintiff talking to himself, talking to the door, pacing, talking or yelling incoherently, dancing, screaming, exhibiting signs of delirium, throwing things, banging on the door, and howling. Id.

Based on the observations of Plaintiff's symptoms recorded in the first of the three Resident Safety/Welfare Logs, which ends at 1:00 a.m. on Sunday May 26, 2013, Sandoval himself drew the conclusion that Plaintiff needed "a mental health evaluation." Doc. 70-6. That conclusion remained unchanged over the course of the next two and one-half days, during which no such evaluation was sought, as Sandoval continued to draw the conclusion that, based on Plaintiff's continuing symptoms, Plaintiff should be "let out" because he needed a "mental evaluation." Id.

Indeed, based on Plaintiff's appearance in "video court," the judge ordered that Plaintiff be transported immediately to the Medical Center for just such an evaluation. Doc. 70-7 at 1. Upon transporting Plaintiff to the Medical Center, Plaintiff's "jailers" reported to the Medical Center that the "chief complaint" for Plaintiff's visit was psychosis. Doc. 70-10. The transporting officials further reported that, while in custody at the Detention Center, Plaintiff had "been in a private secluded room because he [had] been acting psychotic, crazy, boisterous, agitated and some anxiety when in the company of other prisoners." Id.

Viewed together and "in the light most favorable" to Plaintiff, this evidence is more than sufficient to draw the inference that Defendants "subjectively knew of the substantial risk of harm" posed by Plaintiff's untreated psychosis. *Blackmon*, 734 F.3d at 1245. Defendants were on notice that Plaintiff had a psychiatric history, had previously attempted suicide, was

suffering from a current illness or injury, and had been treated for mental illness. Defendants

were also on notice that Plaintiff needed medication. Further, based on their observations of his

obvious symptoms, Defendants not only recognized that Plaintiff needed to see a doctor and

have a mental evaluation, but also actually identified Plaintiff's condition as "psychosis." As

the four-day log of Plaintiff's unrelenting symptoms reflects, Defendants "had a front row seat"

to Plaintiff's prolonged psychotic episode. *Spencer*, 2017 WL 6016309, at *10 (citations

omitted). Defendants had a procedure in place for handling detainee medical emergencies,

namely, sending detainees by ambulance to the Medical Center, and knew that they could send

Plaintiff to that facility over the Memorial Day weekend. Nonetheless, Defendants

undisputedly denied Plaintiff access to medical care for four days. From this evidence, "[a]

reasonable jury could find that [Defendants] possessed a culpable state of mind primarily

because the "facts from which the inference could be drawn that a substantial risk of serious

harm exists were remarkably obvious and [Defendants] had . . . a front row seat to observe

them." *Spencer*, 2017 WL 6016309, at *10 (citations omitted); *see also Lopez*, 2013 WL

1668239 at *5 (observations by defendants of plaintiff while in detention, combined with request

by arresting officer for mental evaluation, provided sufficient facts from which knowledge of

specific risk of harm could reasonably and plausibly be inferred). Accordingly, Plaintiff has

raised an issue of material fact precluding summary judgment against Plaintiff on the subjective

component of the deliberate indifference test. *Mata*, 427 F.3d at 758.

None of Defendants' arguments suggests a contrary conclusion. First, Defendants

contend that because they are not "mental health professionals," the clearly established law

protecting a detainee from deliberate indifference based on the denial of medical care does not

apply to them. Doc. 80 at 12-13. This argument was soundly rejected by the Tenth Circuit in

*Blackmon*, where the court stated that "[b]y 1997 [the Tenth Circuit] had clearly held that the Eighth Amendment is offended not only by medical professionals who fail to treat, but also by prison officials who assume 'gate keeping' authority over prisoner access to medical professionals." 734 F.3d at 1245. Defendants do not deny that they "were at least the mental health 'gate keepers'" at the Detention Center, that they observed Plaintiff's symptoms of psychosis, and that the only steps that they took, namely, segregating Plaintiff and observing him in his cell while his psychotic symptoms continued unabated, failed to help improve his mental state. *Id.* The facts demonstrate as well that Defendants "delayed or denied him access to mental health care by qualified professionals." *Id.* Accordingly, Plaintiff "has produced enough facts that, if credited, could suggest a violation of clearly established law." *Id.* at 1246.

Next, Defendants argue that "it remains undisputed that [Defendants] did not actually draw the inference that a substantial risk of serious harm existed to Plaintiff." Doc. 80 at 14. In support of this argument, Defendants note two facts, namely, that "while detained at the Detention Center, Plaintiff did not suffer any physical harm," and that Defendants "did not have access to Plaintiff's medical records such that they would know what Plaintiff's specific psychiatric diagnoses were, if any, and what medication would be required to treat his psychiatric condition." Id. Neither of these facts proves that Defendants did not actually draw the inference that Plaintiff's psychosis, left medically unattended, posed a substantial risk of serious harm. First, identifying the harm as *physical* harm misunderstands the relevant inquiry. As discussed above in the context of the objective component of the deliberate indifference test, Plaintiff suffered a substantial intermediate harm in the form of prolonged suffering in a psychotic state. Accordingly, the issue presented here, in the context of the subjective component of the deliberate indifference test, is whether Defendants drew the inference from

30

Plaintiff's obvious symptoms that there was a substantial risk that Plaintiff's psychotic state and attendant suffering would be prolonged if left medically unattended. *See Mata*, 427 F.3d at 756 (holding that a detainee may satisfy the subjective component by showing that defendants' failure to provide medical treatment caused unnecessary pain). For the reasons discussed above, viewing the record in the light most favorable to Plaintiff, "one could draw that inference here." *Blackmon*, 734 F.3d at 1245.

Further, even if physical harm were at issue, the fact that Plaintiff did not ultimately suffer any "incident or injury" is irrelevant, as the test for deliberate indifference "does not require actual harm to be suffered." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 899 (6th Cir. 2004) ("A determination that Blackmore's appendix ruptured is not a prerequisite for his Eighth Amendment right to avoid the pain from the officers' deliberate indifference to his obvious need for medical care."). The pertinent inquiry is whether Defendants consciously disregarded a substantial risk of serious harm, not whether the potential harm to which Plaintiff was exposed actually came to pass. *Mata*, 427 F.3d at 756 ("Events occurring subsequent to Ms. Weldon's complete denial of medical care to Ms. Mata have no bearing on whether Ms. Weldon was deliberately indifferent *at the time* she refused to treat Ms. Mata.") (emphasis in original). "[I]t makes no sense to say that [Plaintiff] would have had a valid claim against [Defendants] if [he had injured himself], but [he] does not because [he] was fortunate enough [not to have injured himself despite the fact that Defendants] refused to provide [him] any medical attention." *Id.*

Similarly, in the face of the "remarkably obvious" facts presented to Defendants, it is of no moment that Defendants did not have access to Plaintiff's medical records. *Farmer*, 511 U.S. at 842. Defendants did not need to be aware of Plaintiff's actual diagnosis or the specific name of his medications to be able to infer from Plaintiff's symptoms, in conjunction with

Plaintiff's brother's statement that Plaintiff needed medication and Plaintiff's own report of his psychiatric history and treatment for mental illness, that Plaintiff needed medical attention. In other words, the issue is not whether Defendants knew of Plaintiff's diagnosis and medication, but rather whether they were deliberately indifferent to Plaintiff's obvious need for medical attention. Again, viewing the record in the light most favorable to Plaintiff, "one could draw that inference here." *Blackmon*, 734 F.3d at 1245.

Admittedly, "[i]t remains open to officials to "prove that they were unaware of even an obvious risk to inmate health and safety," and "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 842. Defendants, however, have not come forward with any evidence demonstrating that they were unware, despite Plaintiff's obvious symptoms, of the substantial risk that Plaintiff would remain in his psychotic state unless he were afforded access to medical care. Nor have Defendants established that they "responded reasonably" to the risk of harm to Plaintiff. Defendants appear to argue that it was reasonable for them to segregate Plaintiff "from the general population, checking on him every half-hour," rather than sending Plaintiff by ambulance to the Medical Center, because Plaintiff was not hurting himself and was not at risk of harm by other detainees. Doc. 70 at 11. "The fact that [Defendants] may have taken some action, however, does not mean that they satisfied all of [Plaintiff's] serious medical needs as a matter of law." *Lopez*, 2013 WL 1668239 at *4. The risk at issue here was not that Plaintiff would physically hurt himself or be hurt by others, but rather that his psychotic state would needlessly be prolonged without medical attention. Defendants' response to Plaintiff's obvious symptoms – choosing to leave him in isolation in his cell for four days instead of sending him by ambulance to the

Medical Center – was simply not reasonable, and thus does not spare Defendants from liability.

Nor does the Tenth Circuit's decision in *Sealock* alter this conclusion. In *Sealock*, the plaintiff, who had suffered a heart attack, brought an Eighth Amendment claim against a nurse, a physician's assistant, and a shift commander. After finding that the plaintiff had met the objective component of the deliberate indifference test, the court considered whether the plaintiff also met the subjective component as to each defendant. The nurse saw the plaintiff at the infirmary at 6:00 a.m. and, in response to his statements that he had chest pain and could not breathe, told the plaintiff that he had the flu and that there was nothing she could do for him until the physician's assistant arrived at 8:00 a.m. The court held that the nurse was entitled to summary judgment, explaining: "At worst, she misdiagnosed appellant and failed to pass on information to P.A. Havens about appellant's chest pain." 218 F.3d at 1211. In contrast, as to the shift commander, the court found that the facts demonstrated "for summary judgment purposes that Barrett knew of and disregarded the excessive risk to appellant's heath that could result from the delay." *Id.* at 1210. Specifically, the court noted that there was "evidence that Barrett was informed that appellant might be having a heart attack, and that he was present when appellant displayed symptoms consistent with a heart attack. Barrett allegedly refused to drive appellant to the hospital, and told appellant not to die on his shift." *Id.* Similarly, the court reversed summary judgment in favor of the physician's assistant, because there was evidence that he was informed that the plaintiff was suffering from unexplained chest pain, and yet did not call an ambulance, which, as he himself testified, was the standard procedure when an inmate had unexplained chest pain. *Id.* at 1211.

Contrary to Defendant's contention, the court in *Sealock* thus did not find that "the corrections officials, including the nurse, lacked deliberate indifference." Doc. 80 at 13.

Rather, the court found that the nurse was the *only* one who was not deliberately indifferent to the plaintiff's serious medical needs. As to the two defendants who, in the face of symptoms and notice of a possible heart attack, refused to transport the plaintiff to the hospital or call an ambulance, and thereby denied or delayed the plaintiff access to medical care, the court found sufficient evidence from which a jury could find deliberate indifference. Just as in *Sealock*, Defendants here, in the face of symptoms and notice of possible psychosis, elected not to call an ambulance and thereby denied Plaintiff access to medical care. Accordingly, under *Sealock*, the facts here "demonstrate for summary judgment purposes that [Defendants] knew of and disregarded the excessive risk to [Plaintiff's mental] health that could result from the delay." 218 F.3d at 1210.

Defendants' arguments notwithstanding, the undisputed evidence supports the conclusion that Defendants were in fact aware that Plaintiff was suffering from a psychotic episode and required medical attention, yet did not take the reasonable measure of providing him access to medical attention. A reasonable jury could find that Defendants' refusal to perform their gatekeeping role demonstrated deliberate indifference to Plaintiff's serious medical needs. Accordingly, Plaintiff has raised an issue of material fact on the subjective element of the deliberate indifference test.

      B.    <u>Plaintiff's Constitutional Right Was Clearly Established.</u>

In order to defeat Defendants' motion for summary judgment, Plaintiff must establish not only that Defendants violated his constitutional right to medical care, but also that this right was clearly established at the time of the violation. Specifically, Plaintiff "must show legal authority making it apparent that in light of pre-existing law a reasonable official would have known" that denying a detainee access to medical care, despite notice that the detainee had a

psychiatric history, had been treated for mental illness and was on medication, and despite observing the detainee's obvious symptoms of psychosis, violated Plaintiff's Fourteenth Amendment right. *Lundstrom*, 616 F.3d at 1119. In determining whether Plaintiff's right was clearly established, the "salient question" is whether the state of the law at the time of Plaintiff's detention – May 2013 – gave Defendants "fair warning" that their failure to provide Plaintiff with access to medical care was unconstitutional. *Hope*, 536 U.S at 741. In answering this question, the Court looks in the first instance to "Supreme Court or Tenth Circuit precedent on point." *Lundstrom*, 616 F.3d at 1119.

A review of the relevant Tenth Circuit case law leaves no question that the constitutional right asserted here was clearly established by May 2013. First, in *Olsen*, the Tenth Circuit held that "[t]he right to custodial medical care is clearly established." 312 F.3d at 1315. Thereafter, in *Mata*, the Tenth Circuit reiterated that "deliberate indifference to an inmate's serious medical need is a clearly established constitutional right." 427 F. 3d at 749. In *Kikumura*, the Tenth Circuit further clarified that the "deliberate indifference" standard for claims of inadequate medical care under the Eighth Amendment has "been clearly established at least since *Estelle v. Gamble*, 429 U.S. 97 at 104, decided in 1976." 461 F.3d at 1296. Later, in *Blackmon*, the Tenth Circuit explained that the clearly established right to medical care encompasses psychological needs, holding that "by 1997 it was clearly established law that the deliberate disregard of a patient's psychological needs can violate a detainee's constitutional rights no less than the deliberate disregard of his physical needs." 734 F.3d at 1245 (citing *Ramos v. Lamm*, 639 F.3d 559, 575 (10th Cir. 1980)). Similarly, the *Blackmon* court clarified that the clearly established right to medical care applies to gatekeeping prison officials in addition to medical professionals: "By 1997 this court had clearly held that the Eighth

Amendment is offended not only by medical professionals who fail to treat, but also by prison officials who assume 'gate keeping' authority over prisoner access to medical professionals." *Id.* (citing *Ramos*, 639 F.3d at 575).

Defendants concede that it is clearly established that "pretrial detainees may not be treated with deliberate indifference to their serious medical needs." Doc. 70 at 14. Nonetheless, Defendants argue that "[t]he particular contours of the right Plaintiff asserts can be found nowhere in existing case law." Id. Specifically, Defendants contend that while "Plaintiff was displaying strange behavior which might require a medical evaluation," there was "no indication that Plaintiff was in severe distress, or required emergency medical attention." Id. For this reason, Defendants conclude, this is "the type of 'hazy border' that the law of qualified immunity recognizes as warranting protection for individual officials." Id. at 15.

The Court cannot agree either with Defendants' characterization of the facts or with Defendants' interpretation of the relevant legal inquiry. As discussed above, there was abundant indication – observed, recorded, and identified by Defendants – that Plaintiff was in severe distress and required medical attention in order to alleviate that distress. Further, "the contours of the right" at issue here have been clearly defined and repeatedly reaffirmed by the Tenth Circuit. Defendant has pointed to no authority, and the Court has found none, in which the Tenth Circuit (or any other circuit) has declined to find an inmate or detainee's right to medical care clearly established because the specific factual context in which the right was asserted was different from the factual context of the cases establishing the right in the first instance. Nor has the Court found any cases in which the Tenth Circuit had defined a detainee's right to access to medical care for serious psychological needs with any more specificity than it did in the language quoted above. Indeed, the Tenth Circuit has counseled

36

against the very sort of "scavenger hunt for prior cases with precisely the same facts" upon which Defendants appear to insist.    *Casey*, 509 F.3d at 1284.    There is simply no support for Defendants' argument that the contours of the right asserted here are too hazy to meet the clearly established prong of the qualified immunity test.

To be sure, the Tenth Circuit has cautioned that the inquiry as to whether a right is clearly established may not be undertaken "as a broad general proposition," and accordingly, that the plaintiff is charged with doing more than identifying "in the abstract a clearly established right and alleg[ing] that the defendant has violated it."    *Lundstrom*, 616 F.3d at 1119.    Plaintiff, however, has met his burden of identifying a sufficiently specific right, namely, the right to be afforded access to medical attention for serious psychological needs, and has set forth sufficient facts to support the conclusion that Defendants, as the mental health gatekeepers at the Detention Center, violated this specific right.    The "general constitutional rule" identified in the Supreme Court and Tenth Circuit law discussed above thus "appl[ies] with obvious clarity to the specific conduct in question" here.    *Hope*, 536 U.S. at 741.    In other words, Defendants' failure to take the reasonable measure of providing Plaintiff access to medical care, in conscious disregard of the substantial risk presented by his obvious symptoms of psychosis, falls squarely within the clearly established law.

## CONCLUSION

With regard to his ADA claim, set forth in Count IV of the Complaint, Plaintiff consents to dismissal of this claim as to Defendants.    Accordingly, Defendants' motion for summary judgment is granted as to Count IV.

With regard to his due process claim, set forth in Count V of the Complaint, Plaintiff has shown both that Defendants violated a constitutional right and that the right was clearly

established.   Because Plaintiff thus has satisfied both parts of the qualified immunity inquiry,

Defendants are not entitled to summary judgment against Plaintiff on his due process claim.

Accordingly, Defendants' motion for summary judgment is denied as to Count V.

**IT IS THEREFORE ORDERED** that the Amended Motion for Summary Judgment on

Claims Against Individual County Defendants and Memorandum of Law in Support Thereof

[Doc. 70] is **GRANTED IN PART AND DENIED IN PART**, as follows:   Count IV of

Plaintiff's Complaint is dismissed as against Defendants Salazar, Bernal, and Sandoval; Count V

of Plaintiff's Complaint remains viable.


DATED this 30th day of July, 2018.

MARTHA VAZQUEZ
United States District Judge


Attorneys for Plaintiff
Randy S. Bartell
Alexia Constantaras
Montgomery & Andrews, P.A.

Attorneys for Defendants
Joseph P. Kennedy
Theresa V. Hacsi
Kennedy Kennedy & Ives, LLC